1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFORNIA
10
11   KIMBERLY GUINN,                    )   Case No.  ED CV 16-1356-SP
                                        )
12              Plaintiff,              )
                                        )
13          v.                          )   MEMORANDUM OPINION AND
                                        )   ORDER
14                                      )
     NANCY A. BERRYHILL, Deputy         )
15   Commissioner for Operations of Social )
     Security Administration,           )
16                                      )
                Defendant.              )
17                                      )
     _____ )
18

19                          **I.**

20                  **INTRODUCTION**

21          On June 24, 2016, plaintiff Kimberly Guinn filed a complaint against

22   defendant, the Commissioner of the Social Security Administration

23   ("Commissioner"), seeking a review of a denial of a period of disability, disability

24   insurance benefits ("DIB"), and supplemental security income ("SSI").  The parties

25   have fully briefed the matters in dispute, and the court deems the matter suitable

26   for adjudication without oral argument.

27          Plaintiff presents six disputed issues for decision:  (1) whether the

28

                              1

Administrative Law Judge ("ALJ") properly evaluated plaintiff's credibility; (2) whether the ALJ properly considered the opinion of a treating physician; (3) whether the ALJ properly considered the medical evidence concerning plaintiff's mental impairments; (4) whether the ALJ improperly gave great weight to the consultative examiner's opinion; (5) whether the ALJ properly determined that plaintiff did not meet or equal Listing 1.04A of 20 C.F.R. part 404, Subpart P, Appendix 1 (the "Listings"); and (6) whether the ALJ properly considered lay testimony. Memorandum in Support of Plaintiff's Complaint ("P. Mem.") at 5-23; *see* Memorandum in Support of Defendant's Answer ("D. Mem.") at 3-25.

Having carefully studied the parties' memoranda on the issues in dispute, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly determined that plaintiff did not meet or equal Listing 1.04A and did not improperly give great weight to the consultative examiner's opinion. But the ALJ failed to properly evaluate plaintiff's credibility, failed to properly consider the opinion of a treating physician, failed to properly evaluate the evidence regarding plaintiff's mental impairments, and failed to properly consider lay testimony. The court therefore remands this matter to the Commissioner in accordance with the principles and instructions enunciated in this Memorandum Opinion and Order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was forty-four years old on her alleged disability onset date and has a GED. AR at 40, 78. Plaintiff has past relevant work as a restaurant manager and domestic cleaner. *Id*. at 68.

On July 6 and 11, 2012, plaintiff filed applications for a period of disability, DIB, and SSI due to a broken back, fibromyalsia, arthritis, panic attacks, and depression. *Id*. at 78, 95. The applications were denied initially. *Id*. at 163-71.

2

Upon reconsideration, the application for a period of disability and DIB was denied, as was the application for SSI for the period between May 20, 2012 through January 31, 2013. *Id*. at 175-84. But the Commissioner found plaintiff disabled as of February 1, 2013 due to anxiety and depression with regard to the SSI application. *Id*. at 184-88. Plaintiff filed a request for hearing regarding the denials. *Id*. at 189.

On October 7, 2014, plaintiff appeared and testified at a hearing before the ALJ. *Id*. at 32-77. The ALJ also heard testimony from Mary Jesko, a vocational expert. *Id*. at 67-72. On January 22, 2015, the ALJ denied plaintiff's claims for benefits. *Id*. at 10-22.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since May 20, 2012, the alleged onset date. *Id.* at 12.

At step two, the ALJ found plaintiff suffered from the following severe impairments: history of compression fracture of T11; thoracic spine strain; lumbar spine strain; bipolar disorder; depression; and panic disorder. *Id.*

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the listed impairments set forth in the Listings. *Id.* at 14.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"),[1] and determined plaintiff had the RFC to perform light work, with the limitations that plaintiff could: lift and/or carry twenty pounds occasionally and ten pounds

---

[1] Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

3

frequently; stand and/or walk for six hours out of an eight-hour work day with regular breaks; sit for six hours out of an eight-hour work day with regular breaks; frequently push and pull with the upper and lower extremities; occasionally climb, balance, stoop, kneel, crouch, and crawl; and have no more than occasional contact with coworkers and the public. *Id*. at 15. The ALJ also precluded plaintiff from concentrated exposure to hazards, and limited her to work involving simple and repetitive tasks. *Id*.

The ALJ found, at step four, that plaintiff was incapable of performing her past relevant work as a domestic cleaner and restaurant manager. *Id*. at 20.

At step five, the ALJ found that given plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could perform, including small parts assembler, manufacturing gluer, and seam presser. *Id*. at 21-22. Consequently, the ALJ concluded plaintiff did not suffer from a disability as defined by the Social Security Act ("Act" or "SSA"). *Id.* at 22.

Plaintiff filed a timely request for review of the ALJ's decision, but the Appeals Council denied the request for review. *Id.* at 1-3. The ALJ's decision stands as the final decision of the Commissioner.

### III.

### STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits. 42 U.S.C. § 405(g). The findings and decision of the Social Security Administration must be upheld if they are free of legal error and supported by substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended). But if the court determines the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits. *Aukland v.*

1  *Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d
2  1144, 1147 (9th Cir. 2001).

3      "Substantial evidence is more than a mere scintilla, but less than a
4  preponderance." *Aukland*, 257 F.3d at 1035.  Substantial evidence is such
5  "relevant evidence which a reasonable person might accept as adequate to support
6  a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276
7  F.3d at 459.  To determine whether substantial evidence supports the ALJ's
8  finding, the reviewing court must review the administrative record as a whole,
9  "weighing both the evidence that supports and the evidence that detracts from the
10  ALJ's conclusion." *Mayes*, 276 F.3d at 459.  The ALJ's decision "'cannot be
11  affirmed simply by isolating a specific quantum of supporting evidence.'"
12  *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th
13  Cir. 1998)).  If the evidence can reasonably support either affirming or reversing
14  the ALJ's decision, the reviewing court "'may not substitute its judgment for that
15  of the ALJ.'"  *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir.
16  1992)).

## IV.

## DISCUSSION

**A.    The ALJ Improperly Discounted Plaintiff's Credibility**

20      Plaintiff argues the ALJ failed to properly consider her credibility.  P. Mem.
21  at 5-15.  Specifically, plaintiff contends that none of the reasons the ALJ provided
22  for finding her less credible were clear and convincing and supported by
23  substantial evidence.  *See id.*

24      The ALJ must make specific credibility findings, supported by the record.
25  Social Security Ruling ("SSR") 96-7p.[2]  To determine whether testimony

27      [2]    "The Commissioner issues Social Security Rulings to clarify the Act's
28  implementing regulations and the agency's policies.  SSRs are binding on all

concerning symptoms is credible, the ALJ engages in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether a claimant produced objective medical evidence of an underlying impairment "'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *accord Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003). The ALJ may consider several factors in weighing a claimant's credibility, including: (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346.

At the first step, the ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged. AR at 17. At the second step, because the ALJ did not find any evidence of malingering, the ALJ was required to provide clear and convincing reasons for discounting plaintiff's credibility. Here, the ALJ discounted plaintiff's credibility because: (1) her allegations were too extreme in light of the objective medical evidence; (2) plaintiff received routine and conservative treatment; (3) her activities of daily living demonstrated she was not as limited as alleged; and (4) plaintiff failed to

---

components of the SSA. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (internal citations omitted).

seek treatment from a specialist for her mental disorder. *Id*. at 16-17.

At the October 7, 2014 hearing, plaintiff testified that she suffered from back and joint pain, bipolar disorder, and depression. *Id*. at 52, 54. Plaintiff testified that after she fractured her back on May 20, 2012, physicians explained to her that she would have to wait for about a year to see if her pain subsided, and if it did not she would require a kyphoplasty procedure. *Id*. at 49. But her subsequent physicians offered different opinions about the course of treatment, including whether surgery was a viable option given the age of her fracture and the invasiveness of the procedure. *Id*. at 49-50, 64. Plaintiff testified that she used a walker, but was told to wean off the walker and back brace because they were causing kyphosis. *Id*. at 52-53. Plaintiff further testified that at the time of her injury she could only do light housework such as feather dusting and her friend made her lunch everyday. *Id*. at 58-59. At the time of the hearing, plaintiff's legs would go numb when a lot of weight pressed on her body; she stayed in a reclined position about seventy percent of the time; she could not scrub, polish, or clean floors; and she could lift and/or carry ten pounds but had to use both hands to pour a gallon of milk. *Id*. at 58, 61-63. Regarding her mental health, plaintiff testified that the accident made her depression worse, she felt hopeless because of the pain, and she did not like to go out unless with a close friend. *Id*. at 54, 64. Plaintiff testified that, prior to May 2012, she had not seen a physician in four years because she did not have insurance. *Id*. at 60-61.

In Function Reports dated September 29, 2012 and June 21, 2013, plaintiff stated that she could do light laundry, do dishes, make the bed, take care of three small dogs with help from others, and go out to dinner a couple of times a month with her boyfriend. *Id*. at 278-79, 331-32. Plaintiff also stated that she shopped for groceries about once a month and prepared meals such as soup, sandwiches, frozen food, and cereal, all of which only took a couple of minutes at a time, on a

daily basis. *Id*. at 279-80. Plaintiff reported difficulties with personal care. *Id*. at 278, 331.

In a Pain Questionnaire dated June 20, 2013, plaintiff stated that she suffered from chronic pain that shot from her back to the rest of her body. *Id*. at 326. Plaintiff stated that daily activities such as washing dishes and housekeeping were "nearly impossible." *Id*. Plaintiff used a back brace at all times except when siting, resting, or laying down, and used a walker if she had to walk "very far." *Id*. at 327.

The first reason the ALJ provided for finding plaintiff less credible was her allegations were "too extreme in light of the objective medical evidence." *Id*. at 16; *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (lack of corroborative objective medical evidence may be one factor in evaluating credibility). In other words, the ALJ found the objective medical evidence did not support plaintiff's alleged symptoms and limitations. Specifically, the ALJ noted that although plaintiff fractured her T11 vertebrae, she did not suffer from neurological deficits and the evidence suggested the walker was not a medical necessity. AR at 16. The ALJ's reasoning was not supported by substantial evidence.

Plaintiff fractured her spine on May 20, 2012. *See id*. at 296. At the time, diagnostic images showed that plaintiff suffered a 40% acute compression fracture at T11 with minimal spine stenosis at that level and had mild spondylotic change at L5-S1 with a 3mm posterior disc bulge causing mild spinal canal stenosis. *Id*. at 296, 298. Diagnostic images from October 2012 showed that plaintiff's injuries had not improved and, indeed, had become more severe. An October 2, 2012 CT scan showed plaintiff's compression fracture now reflected a loss of height of 50-60% and an October 30, 2012 MRI reflected an approximately 60% loss of vertical height anteriorally at T11, as well as moderate disc narrowing, anterior osteophyte

formation, along with endplate degenerative changes at T7-8. *Id*. at 479-80, 483. Plaintiff also reported falling multiple times that month. *Id*. at 684. Between November 2012 and January 2013, physical examinations reflected, among other things, a decreased range of motion in plaintiff's spine, tenderness, spasms, and normal sensation. *See, e.g., id*. at 495-507, 622. In January 2013, plaintiff was able to walk with a slow, deliberate pace unassisted at her consultative examination but could not squat. *Id*. at 504. In August 2013, an x-ray showed a partial collapse at the fracture and increased kyphosis. *Id*. at 610. Plaintiff continued to have tenderness at the thoracic spine, but had full muscle strength in her extremities and normal sensation in the cervical and lumbar spine. *Id*. at 614-17. In May 2014, an MRI showed that plaintiff continued to suffer from a T11 compression fracture with approximately 60% loss of height anteriorly and centrally, slightly exaggerated thoracic kyphosis at T10-11, and degenerative disc disease at T7-8 with reactive edema along the endplates at T7-8. *Id*. at 624-25. In July 2014, physicians observed plaintiff had a weak gait, but had full range of motion in her extremities and normal sensation, and that she reported multiple falls in the last year. *Id*. at 647, 654.

Contrary to the ALJ's findings, plaintiff's allegations were not "too extreme" in light of the objective medical evidence. The evidence showed that despite several physicians' opinions that plaintiff's injury would heal within twelve months (*see id*. at 104-05, 175), plaintiff's compression fracture never healed and actually worsened in severity from a 40% loss of height anteriorly in May 2012 to a 60% loss of height anteriorly in October 2012 to a 60% loss of height anteriorly and centrally in May 2014. *Id*. at 296, 483, 624-25. In addition, plaintiff developed kyphosis and had a weak gait. *See id*. at 610, 647, 654. Regarding neurological deficits, although plaintiff had normal sensation in the cervical and lumbar spine and infrequently complained of numbness, plaintiff had

tenderness in the thoracic spine and difficulty with walking and standing. Thus, regardless of whether a walker was medically necessary, the evidence supports plaintiff's complaints of pain and physical limitations.

The second basis for the ALJ's credibility finding was that plaintiff received routine and conservative treatment. *Id*. at 17; *see Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment.") (internal quotation marks and citation omitted). The ALJ determined that plaintiff was only treated with pain medication and a back brace, and no physician recommended a more aggressive treatment. AR at 17. Although the ALJ correctly noted that plaintiff was treated conservatively initially, a review of the entire record shows that later changed. Plaintiff was initially treated conservatively with narcotic pain medication, a back brace, and physical therapy because the hospital wanted to see if the fracture would heal and the pain would subside. *See id.* at 48, 361, 364, 622-23; *Huizar v. Comm'r*, 428 Fed. Appx. 678, 680 (9th Cir. 2011) (finding that plaintiff responded favorably to conservative treatment, which included "the use of narcotic/opiate pain medications"). Most compression fractures heal within twelve months. *See, e.g., id.* at 175. But plaintiff's fracture did not heal and the pain did not subside, and plaintiff asserts that the physicians could not agree on a treatment plan. *Id*. at 49-50, 64.

In 2014, because conservative treatment was not successful, a treating physician recommended surgery, which was denied by the insurance company. *See id*. at 701-02; *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (failure to seek treatment may be a basis for an adverse credibility finding unless there was a good reason for not doing so). After surgery was denied, plaintiff received bilateral thoracic facet injections. AR at 687; *see Lapeirre-Gutt v. Astrue* , 382 Fed. Appx. 662, 664 (9th Cir. 2010) (treatment consisting of "copious" amounts of narcotic

pain medication, occipital nerve blocks, and trigger point injections was not conservative). The fact that the request for a surgery authorization and the steroid injections did not occur until 2014 did not mean that plaintiff could not have been disabled between May 2012 and January 2013. To the contrary, it shows that plaintiff's fracture never healed within twelve months as expected and conservative treatment was ineffective.

The ALJ's third reason for finding plaintiff less credible – her activities of daily living were not as limiting as would be expected – was similarly not supported by substantial evidence. AR at 17; *see Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (inconsistency between a claimant's testimony and conduct may be a clear and convincing reason to discount his testimony). The ALJ found that plaintiff's ability to take care of three dogs, perform light household chores, prepare simple meals, shop for groceries, go out to dinner a few times each month, and live alone most of the time diminished her credibility. AR at 17. A claimant does not need to be "utterly incapacitated." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he mere fact a [claimant] has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). But a claimant's ability "to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting" may be sufficient to discredit her. *Morgan v. Comm'r*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, it is unclear how plaintiff's daily activities, as described by the ALJ, were inconsistent with her testimony. None of the activities required great exertion or for plaintiff to stand, walk, or exert herself for a substantial part of the day. It is also unclear how the ability to go out to dinner with her boyfriend a few times a month showed plaintiff could work. Moreover, the ALJ appeared to only cherry

pick parts of plaintiff's statements.  For example, the ALJ stated that plaintiff reported she took care of three dogs.  But the ALJ failed to note that plaintiff reported that she fed and took care of the dogs with assistance from others.  AR at 278, 332.  Plaintiff stated that her boyfriend, son, or friends prepared the food and water, and she just let the dogs in and out of the house.  *Id.*  As for meal preparation, plaintiff stated that she prepared simple meals such as soup, sandwiches, and frozen food, all of which only took a few minutes to prepare.  *Id.* at 279, 331.  Finally, plaintiff shopped for groceries, but the ALJ failed to report that plaintiff only did it once a month.  *Id.* at 280, 333.  As such, the evidence did not show that plaintiff's activities were inconsistent with her allegations.

Fourth, the ALJ found plaintiff less credible because she failed to seek treatment from a mental health specialist and had not been hospitalized in a psychiatric facility.  *Id.* at 17.  In fact, plaintiff did seek treatment for her mental disorders, just not from a specialist.  As the ALJ acknowledged, plaintiff's primary care physician prescribed her psychiatric medication.  The failure to seek more specialized treatment is not a clear and convincing reason for an adverse credibility finding if there is a good reason for it.  *See Orn*, 495 F.3d at 638.  Plaintiff did not have insurance for approximately four years.  AR at 60, 357.  After plaintiff obtained insurance, she attempted to seek treatment from a specialist.  During an October 19, 2012 phone call to her primary care physician's office regarding her depression and anxiety, plaintiff reported that she already had an appointment with the Mental Health Clinic but the earliest available appointment was in February 2013.  *See id.* at 685.  A lack of psychiatric hospitalization was also not a clear and convincing reason for finding plaintiff less credible.  *See Kuharski v. Colvin*, 2013 WL 3766576, at *5 (E.D. Cal. Jul. 16, 2013) (a claimant's lack of psychiatric hospitalization does not support an adverse credibility finding); *accord Finn v. Astrue*, 2013 WL 501661, at *5 (C.D. Cal. Feb. 7, 2013) (lack of hospitalization

was not a specific and legitimate reason to reject a physician's opined mental limitations).

In sum, none of the ALJ's reasons for an adverse credibility finding were clear and convincing and supported by substantial evidence.

**B.    The ALJ Erred, in Part, With Regard to His Evaluation of the Medical Evidence Concerning Plaintiff's Physical RFC**

Plaintiff argues that the ALJ failed to properly consider the medical opinions. *Id*. at 15-18, 20. Specifically, plaintiff contends the ALJ rejected the opinion of a treating physician, Dr. Michael Lam, without providing specific and legitimate reasons, and improperly gave great weight to the opinion of consultative examiner Dr. Vincente R. Bernabe. *Id*.

In determining whether a claimant has a medically determinable impairment, among the evidence the ALJ considers is medical evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b).[3] In evaluating medical opinions, the regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (as amended). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan*, 246 F.3d at 1202; 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *Smolen*, 80 F.3d at 1285; *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

---

[3]    All citations to the Code of Federal Regulations refer to regulations applicable to claims filed before March 27, 2017.

Nevertheless, the ALJ is not bound by the opinion of the treating physician. *Smolen*, 80 F.3d at 1285. If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight. *Lester*, 81 F.3d at 830. If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it. *Id.* at 830. Likewise, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting the contradicted opinions of examining physicians. *Id.* at 830-31. The opinion of a non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 n.2 (9th Cir. 2006); *Morgan*, 169 F.3d at 602; *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

### 1. **Dr. Lam**

Dr. Michael Lam, an internist, treated plaintiff from January 2013 through at least the date of the hearing. AR at 630. The record contains none of Dr. Lam's treatment notes but indicates that Dr. Lam referred plaintiff to Dr. Andrew H.S. Thio, a pain management specialist. *See, e.g., id*. at 697. In a Residual Functional Capacity Questionnaire – Spine, dated August 27, 2014, Dr. Lam diagnosed plaintiff with chronic mid back pain secondary to a thoracic/T11 fracture. *Id*. at 630. Dr. Lam based his diagnoses on plaintiff's MRI and tenderness at the thoracic spine. *Id*. Dr. Lam also noted that he observed plaintiff had an abnormal gait and tenderness. *Id*. Dr. Lam opined plaintiff could: walk one city block without rest or severe pain; sit one hour before needing to get up; stand for twenty minutes before needing to sit down or walk around; sit and stand/walk for about two hours in an eight-hour work day; lift and carry ten pounds occasionally and twenty pounds rarely; occasionally twist; rarely stoop, crouch, and climb stairs; and occasionally handle and finger. *See id*. at 631-33. In addition, Dr. Lam opined plaintiff needed to walk for three minutes every hour; needed a job which permitted her to shift

positions at will from sitting, standing, or walking; needed to take five-minute unscheduled breaks every hour during the work day; did not require an assistive device for occasional standing and walking; could never climb ladders; and would likely be absent from work more than four days a month. *See id*. at 632-34. Finally, based on the diagnostic images, Dr. Lam opined that these limitations had been applicable since May 20, 2012. *Id*. at 634.

## 2. Dr. Bernabe

Dr. Vincente R. Bernabe, an orthopedic surgeon, examined plaintiff on January 31, 2013. *Id*. at 502-07. Dr. Bernabe reviewed diagnostic images from May 20 and 25, 2012, as well as a treatment note from July 13, 2012. *Id*. at 502-03. Dr. Bernabe observed that plaintiff: could walk with a slow, deliberate pace unassisted so an assistive device was not medically necessary; could not squat; had tenderness along the thoracolumbar region; had muscle spasm on the back; had reduced range of motion in the lumbar spine; had normal range of motion in the extremities; and had normal motor strength and sensation. *Id*. at 504-06. Based on the examination and the images, Dr. Bernabe diagnosed plaintiff with a T11 compression fracture with no retropulsion, thoracolumbar musculoligamentous strain, and degenerative disc disease of the thoracic and lumbar spine. *Id*. at 506. Dr. Bernabe opined that plaintiff could: lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours out of an eight-hour day; sit six hours out of an eight-hour day; occasionally push and pull; and perform "postural" and "agility" on an occasional basis.[4] *Id*. at 507. Plaintiff testified that Dr. Bernabe's examination lasted about five minutes. *Id*. at 65

## 3. Other Examining Physicians

Two physicians from the Orthopedic Surgical Spine Clinic ("Spine Clinic")

---

[4] It is unclear what specific postural and agility limitations Dr. Bernabe opines. *See* AR at 507.

15

examined plaintiff.  On July 13, 2012, Dr. Rahul Basho examined plaintiff.[5]  *Id.* at 461-62.  Dr. Basho observed plaintiff had normal sensation and strength in her extremities with some slight limitation secondary to pain.  *Id.* at 461. Dr. Basho noted that plaintiff underwent a hysterectomy at age 24 and was not undergoing hormone therapy, and that these factors could potentially be contributing to an appearance of osteopenia and explain the injury.  *Id.*  Because plaintiff was in significant pain and only had the May 2012 diagnostic images, Dr. Basho requested new radiologic studies to be taken in order to rule out pathologic fracture.  *Id.*  Initially denied, the insurance company finally authorized the images in October 2012.  *Id.* at 467.

On November 16, 2012, Dr. Dennis Cramer of the Spine Center examined plaintiff and reviewed her new images.[6]  *Id.* at 465.  Dr. Cramer observed plaintiff had no numbness or tingling in her lower extremities, had no bowel or bladder incontinence, had tenderness to palpation in the T10 through T12 area, had limited flexion and extension, and was otherwise neurovascularly intact.  *Id.*  Dr. Cramer noted the MRI of the thoracic spine showed a T11 anterior compression fracture measuring 9.4 mm in height in the anterior third, that 27-degrees of kyphosis incidental of Schmorl node was noted in the superior endplate of T11, and the fracture possibly was not undergoing anymore remodeling.  *Id.*  Dr. Cramer determined the fracture was stable.  *Id.*  Based on x-rays and an examination in August 2013, Dr. Cramer again opined the fracture was stable.  *Id.* at 616-17.

### 4.    State Agency Physicians

Dr. E.L. Gilpeer, a State Agency physician, reviewed plaintiff's medical

---

[5]    The treatment note was dictated by Dr. Michael Dempewolf but signed Dr. Rahul Basho.  *See* AR at 461-62.

[6]    Dr. Steven Brown dictated the treatment note and Dr. Dennis Cramer signed it.  AR at 465-66.

records from May 2011 through January 2013, as well as Dr. Bernabe's opinion. *See id.* at 86-87, 103-04.  Based on his review of the records, Dr. Gilpeer opined plaintiff had the RFC to: lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance, kneel, crouch, and crawl; and occasionally stoop. *See id.* at 90-91, 107-08.

Dr. Jayant Desai, a State Agency physician, reviewed plaintiff's medical records from May 2012 through April 2013 upon reconsideration.  *See id.* at 125-26, 151-52.  Dr. Desai issued a more restrictive RFC than Dr. Gilpeer, opining the same standing, walking, and sitting limitations but limiting plaintiff to: lift/carry twenty pounds occasionally and ten pounds frequently; limited pushing and pulling; and occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  *See id.* at 133, 157.

## 5. The ALJ's Findings

From a physical perspective, the ALJ determined plaintiff had the RFC to perform light work with the following limitations, plaintiff could: lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday with regular breaks; sit for six hours out of an eight-hour workday with regular breaks; frequently push and pull; and occasionally climb, balance, stoop, kneel, crouch, and crawl.  *Id.* at 15.  In reaching that determination, the ALJ gave great weight to Dr. Bernabe's opinion, little weight to the opinions of the State Agency physicians, and no weight to Dr. Lam's opinion. *Id.* at 19-20.

The ALJ gave Dr. Bernabe's opinion great weight because he examined plaintiff, he reviewed the medical records from the Spine Center and the diagnostic images, and his opinion was consistent with his examination findings and the findings by the Spine Center physicians.  *Id.* at 19.  The ALJ gave no weight to Dr.

Lam's opinion because the opinion was based on medical evidence outside of the relevant period and it was not supported by the medical evidence from the period at issue. *Id*. at 20. And the ALJ gave the opinions of the State Agency physicians little weight because the opinions were "too generous" in light of plaintiff's fracture and inconsistent with Dr. Bernabe's opinion.[7] *Id*. at 19. Plaintiff contends the ALJ improperly gave great weight to Dr. Bernabe's opinion and improperly rejected Dr. Lam's opinion. P. Mem. at 15-18, 20.

With regard to Dr. Bernabe, plaintiff argues that the examination was too short in duration – about five minutes – and therefore could not constitute substantial evidence. *Id*. at 20; *see Orn*, 495 F.3d at 632 (the opinion of an examining physician may constitute substantial evidence if based on independent clinical findings). Plaintiff contends the regulation at 20 C.F.R. §§ 404.1519n(a)(2), 416.919n(a)(2) requires a consultative musculoskeletal examination to last at least twenty minutes. *Id*. But the text of the regulation states the scheduled interval is not simply the actual duration of the consultative examination, but also includes "time set aside for the individual," which reasonably may include any time a consultative examiner spends reviewing a claimant's medical records or taking a history. *See* 20 C.F.R. §§ 404.1519n(a), 416.919n(a). While the short duration of the examination should be taken into consideration, it was nonetheless reasonable for the ALJ to assume Dr. Bernabe spent at least twenty minutes on plaintiff's case overall. Therefore, the fact that the actual examination was only five minutes did not mean Dr. Bernabe's opinion could not constitute substantial evidence.

Plaintiff could have, but did not, argue that the ALJ's reasons for giving Dr.

---

[7] The ALJ appears to attribute Dr. Gilpeer's opinion to Dr. Desai. Dr. Gilpeer opined plaintiff could perform medium work while Dr. Desai limited plaintiff to light work. *Compare* AR at 90-91, 107-08 with 133, 157. The ALJ's RFC determination was actually nearly identical to Dr. Desai's opinion.

Bernabe's opinion great weight were not supported by substantial evidence. For instance, the fact that Dr. Bernabe examined plaintiff simply meant that his opinion may constitute substantial evidence, not that it must be given great weight. Morever, it is disputable whether the ALJ's other reasons for giving Dr. Bernabe's opinion great weight were supported by substantial evidence. First, the ALJ noted Dr. Bernabe reviewed the medical records from the Spine Center and diagnostic evidence in the record. AR at 19. But Dr. Bernabe actually only reviewed one treatment note and the initial images. *See id*. at 502-03. This review did not include treatment notes from other sources and more recent diagnostic images in October 2012, which showed the fracture increased in severity. *See id.* at 409-15, 463, 479-80, 483, 495-501, 684, 715. Second, the ALJ found that Dr. Bernabe's opinion was consistent with his examination findings. *See id.* at 19. But Dr. Bernabe's observations that plaintiff walked with a slow, deliberate pace, could not perform a squat, and had decreased range of motion in her lumbar spine were inconsistent with his opinion that plaintiff could stand and walk six hours a day, could perform postural activities occasionally, and could perform activities requiring agility occasionally. *See id*. at 504, 507. Finally, the ALJ correctly found Dr. Bernabe's findings were consistent with the findings of the Spine Center physicians. The Spine Center physicians, however, did not offer an opinion about plaintiff's functional limitations. The fact that the Spine Center physicians had similar findings of tenderness, normal sensation and decreased range of motion did not mean they would have likewise opined the same limitations. Since plaintiff did not raise these arguments, however, the court here does not find error by the ALJ with respect to Dr. Bernabe.

As for the ALJ's evaluation of Dr. Lam's opinion, the ALJ's rejection of Dr. Lam's opinion was not supported by substantial evidence. First, rejecting a medical opinion simply because it was made after the relevant period is not a specific and legitimate reason. *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th

Cir.1988) ("[M]edical reports are inevitably rendered retrospectively and should not be disregarded on that basis."). "'[M]edical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the pre-expiration condition.'" *Taylor v. Comm'r*, 659 F.3d 1228, 1232 (9th Cir. 2011) (citation omitted) (finding that the ALJ must consider medical opinions relevant to the insured period). An evaluation made after the insured period may shed light on the severity and existence of the impairment during the insured period. *See Smith*, 849 F.2d at 1225-26. That is particularly the case here, where Dr. Lam opined that the limitations he found had been in place since May 20, 2012. *See* AR at 634.

The ALJ's second reason for rejecting Dr. Lam's opinion was also not specific and legitimate and supported by substantial evidence. The ALJ simply stated, in conclusory fashion, that the medical evidence from May 20, 2012 through January 31, 2013 did not support Dr. Lam's opinion, but failed to explain why. *Id.* at 20. Simply stating that a medical opinions is not supported by sufficient objective evidence "does not achieve the level of specificity" required. *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Further, contrary to the ALJ's conclusory assertion, the medical evidence supported Dr. Lam's opinion that plaintiff's limitations began on May 20, 2012. AR at 634. As discussed above, in May 2012 plaintiff suffered a 40% acute compression fracture. *Id*. at 296, 298. The second set of diagnostic images from October 2012 showed that plaintiff experienced an increased loss of height at T11 to approximately 60% loss of vertical height anteriorly, as well as thoracic kyphosis and degenerative disc disease at T7-8. *See id*. at 479-80, 483. And the third set of MRI images from May 2014 again showed a slight increase in severity as the loss of height was then both anteriorly and centrally. *See id.* at 624-25. Moreover, plaintiff experienced tenderness in the thoracic spine, exhibited reduced range of motion, and had spasm. *See id*. at 465, 500, 504, 622. These objective findings reasonably support

Dr. Lam's opinion that plaintiff's limitations were caused by the May 2012 injury, which had never healed.

Accordingly, the ALJ properly found that Dr. Bernabe's opinion could constitute substantial evidence because the ALJ could reasonably assume the duration of the examination met the regulatory minimum requirement, but the ALJ improperly rejected Dr. Lam's opinion without providing specific and legitimate reasons.

**C.**     **The February 1, 2013 Onset Date of Plaintiff's Disability Due to a**
     **Mental Impairment Was Not Supported by Substantial Evidence**

Plaintiff argues that the ALJ erred when he determined her mental impairment did not date back to the alleged onset date.  P. Mem. at 18-19.  Specifically, plaintiff contends the ALJ failed to properly consider the opinion of treating psychiatrist Dr. Maureen C. Terrazano.  *See id.*

**1.**     **Medical History and Evaluations**

Plaintiff reported that she had suffered from symptoms of a mental disorder since she was nine years old.  *See* AR at 449.  The medical records show that plaintiff was on medication for a mental disorder as early as May 2010.  *See id.* at 421.  Plaintiff repeatedly complained of anxiety throughout 2011 and 2012.  *See, e.g., id.* at 357, 393, 411, 419, 684.  Plaintiff testified that her symptoms worsened after the injury.  *Id.* at 54.  Plaintiff did not have insurance from approximately 2008 through 2012.  *Id.* at 60-61.  After plaintiff obtained insurance, she sought treatment from a mental health specialist.  Plaintiff made an appointment prior to October 19, 2012, but the earliest available appointment was in February 2013. *See id.* at 685.

On November 2, 2012, Dr. Ana Maria Andia, a psychiatrist, examined plaintiff.  *See id.* at 448-55.  Dr. Andia reviewed a social security Disability Report, an Adult Function Report, and a May 9, 2012 treatment note from Dr. Christopher Jorteg, an internist.  *See id.* at 448-49.  Plaintiff reported, among other

things, that her symptoms of depression and anxiety got worse in May 2012, she suffered from panic attacks, and she had problems with insomnia and low energy. *See id*. at 449. Plaintiff reported that she sometimes needed help with personal care, could not go out alone, had no difficultly completing household tasks, and did light household chores such as cooking, laundry, and washing dishes. *Id*. at 451. Dr. Andia observed plaintiff had a coherent and organized thought process, had a depressed and anxious mood, was tearful at times, spoke slowly and with a monotonous tone, was alert, and appeared to have intact insight and judgment. *Id*. at 452-54.

Based on her examination and review of reports, Dr. Andia's diagnostic impression was that plaintiff suffered from: dysthymic disorder; panic disorder with agoraphobia; benzodiazepine dependence; amphetamine abuse in remission; and alcohol abuse. *Id*. at 454. Dr. Andia noted that plaintiff's pain medications could make depression worse and cause cognitive difficulties, and she recommended a change in plaintiff's medications. *See id*. Dr. Andia opined that plaintiff's condition would be expected to improve in the next twelve months with active treatment. *Id*. From a functional perspective, Dr. Andia opined plaintiff had primarily mild limitations. *Id*. at 455.

Dr. Terrazano treated plaintiff from February 2013 through at least the date of the hearing. *See id.* at 55, 533-38. Plaintiff complained of depression, hypersomnia, anxiety, low concentration, and pain. *Id*. at 551. Plaintiff reported that she was isolative, did not like to go out, and did not like to stay home alone. *Id*. at 519-20, 553-54. Dr. Terrazano observed plaintiff was fearful, obsessive, tearful, and alert, and had low energy and trouble focusing. *Id*. at 536, 552-53. Dr. Terrazano diagnosed plaintiff with bipolar disorder and panic disorder. *Id*. at 555. Dr. Terrazano stated that the prognosis was guarded "in light of [the] chronic nature of [plaintiff's] illness." *Id*. Based on her treatment, Dr. Terrazano opined plaintiff had, among other things: moderate limitations in her ability to remember

locations and work-like procedures, carry out very short and simple instructions, and ask simple questions or request assistance; moderately severe limitations in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and interact appropriately with the public; and severe limitations in her ability to carry out detailed instructions, perform activities within a schedule, and complete a work-day and week without interruptions. *Id*. at 556-58.

The initial review State Agency physician, Dr. Herbert Ochitill, reviewed plaintiff's medical records prior to February 1, 2013. *Id*. at 86-87, 103-04. The State Agency physicians opined plaintiff would be moderately limited in her ability to carry out detailed instructions, perform activities within a schedule, and complete a normal workday. *Id*. at 92, 109.

The State Agency physician upon consideration, Dr. Aroon Suansilppongse, reviewed the same medical records, as well as Dr. Terrazano's notes and opinions. *Id*. at 125-27, 151-53. Dr. Suansilppongse opined that, from February 2013 forward, plaintiff had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation. *Id*. at 129-30. Prior to February 2013, Dr. Suansilppongse opined plaintiff only had mild difficulties. *Id*. at 130. As such, with regard to the SSI application, Dr. Suansilppongse opined plaintiff was disabled as of February 1, 2013. But with regard to the DIB application, Dr. Suansilppongse opined plaintiff was not disabled before the date last insured. *Id*. at 156.

## 2.  The ALJ's Findings

The ALJ determined plaintiff was limited to work involving simple and repetitive tasks and could have no more than occasional contact with coworkers and the public. *Id*. at 15. In reaching the mental RFC determination, the ALJ gave great weight to the opinions of the State Agency physicians, Dr. Ochitill and Dr.

Suansilppongse, little weight to Dr. Andia's opinion, no weight Dr. Terrazano's opinion, and the benefit of the doubt to plaintiff. *Id.* at 20. The ALJ gave great weight to the opinions of the State Agency physicians on the bases that they were consistent with the record, including the findings of Dr. Andia's examination. *Id.* The ALJ gave little weight to Dr. Andia's opinion because it was inconsistent with her own findings and plaintiff's subjective complaints. *Id.* And the ALJ discounted Dr. Terrazano's opinion because it was completed after January 2013 and therefore based on findings not within the relevant period, and unsupported by the medical findings from the relevant period. *Id.*

The issue here is not whether Dr. Terrazano's opinion should be given great weight. The Commissioner credited the opinion when finding plaintiff was disabled due to a mental disorder as of February 1, 2013. *See id.* at 184. Rather, the question is whether the ALJ properly found that Dr. Terrazano's opinion was irrelevant for the period from May 20, 2012 through January 31, 2013.

As discussed above, the fact that an opinion was issued after the relevant period was not a specific and legitimate reason to reject it. *Taylor*, 659 F.3d at 1225; *Smith*, 849 F.2d at 1225. Opinions may be retroactive. In contrast to Dr. Lam's opinion, however, Dr. Terrazano did not indicate to what time period her opined limitations applied. Nevertheless, the fact that Dr. Terrazano issued her opinion after January 31, 2013 was still not a specific and legitimate reason to discount it. The opinion could still shed light on plaintiff's condition prior to Dr. Terrazano's first examination.

The question then is whether the ALJ's finding that Dr. Terrazano's opinion was not supported by medical evidence from May 20, 2012 through January 31, 2013 was supported by substantial evidence. Again, the ALJ's conclusory statement was insufficient because the ALJ must explain with some specificity how the evidence did not support the opinion. *See Embrey*, 849 F.2d at 421-22. The ALJ appears to have reached this decision solely based on the fact that plaintiff had

only one reported panic attack during the relevant period and was not treated by a mental health specialist prior to February 2013, while disregarding her continuous complaints about anxiety, the treatment received by her primary care physicians throughout the relevant period, and her unsuccessful attempt to obtain specialized treatment as early as October 2012. *Id.* at 17, 19, 411, 472, 684-85. But the fact that plaintiff was not treated by a specialist until February 2013, by itself, was not substantial evidence that plaintiff was not disabled prior to her treatment by Dr. Terrazano. To the contrary, it would seem unlikely that plaintiff's mental impairment coincidentally only became disabling upon treatment. Indeed, Dr. Suansilppongse, despite crediting Dr. Terrazano's opinion, seemed to also express some disbelief in her assessment, remarking that it would have meant that plaintiff had a "remarkable decline in functioning since" her consultative examination. *See id.* at 153. In sum, the ALJ's finding that Dr. Terrazano's opinion was not supported by medical evidence from the relevant period appears to be based on the absence of evidence rather than inconsistency. Because the absence of medical evidence can be explained by plaintiff's inability to obtain specialized care until February 2013, it did not constitute substantial evidence.

The ALJ's finding may ultimately be affirmed upon remand, but the reasons provided here were not specific and legitimate and supported by substantial evidence.

**D.    The ALJ Did Not Err at Step Three**

Plaintiff contends the ALJ erred at step three. P. Mem. at 20-22. Plaintiff argues she met or equaled Listing 1.04A and, in the alternative, the ALJ should have called a medical expert to testify. *Id.*

At step three, Social Security regulations provide that a claimant is disabled if he or she meets or medically equals a listed impairment set forth in the Listings. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) ("If you have an impairment(s) that meets or equals one of our listings . . . we will find that you are disabled.");

404.1520(d), 416.920(d) ("If you have an impairment(s) which . . . is listed in Appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."). In other words, if a claimant meets or equals a Listing, he or she will be found disabled at this step "without further inquiry." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). In such case, there is no need for the ALJ to complete steps four and five of the sequential process. *Lewis*, 236 F.3d at 512.

"To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim." *Tackett*, 180 F.3d at 1099. To establish that an impairment is medically equivalent to a listed impairment, it is the claimant's burden to show his impairment "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). For an impairment or combination of impairments to equal a Listing, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990), *superseded by statute on other grounds as stated in Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013); *see* 20 C.F.R. §§ 404.1526(a)-(b), 416.926(a)-(b). A determination of medical equivalence must rest on objective medical evidence. *See Lewis*, 236 F.3d at 514 ("A finding of equivalence must be based on medical evidence only."). "If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Commissioner] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing." 20 C.F.R. §§ 404.1526(b)(2), 416.926(b)(2).

Here, plaintiff failed to demonstrate his impairments met or were medically equivalent to any Listing.

Listing 1.04A provides as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal

arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Listing 1.04A.

In order to meet Listing 1.04A, a claimant must show that she suffered from a disorder of the spine and nerve root compression. Plaintiff tacitly concedes that she did not have any neurological deficits. *See* P. Mem. at 20-22; Reply at 1-3. Indeed, the evidence plainly showed that plaintiff had a vertebral fracture and degenerative disc disease, but there was no evidence of nerve root compression. *See id.* at 375, 483, 624-25. None of the physicians opined or observed neurological deficits. *See, e.g., id.* at 461-62, 465, 502-07, 689-96. And although the record reflects that plaintiff suffered from chronic pain, decreased range of motion in her back, an abnormal gait, and tenderness, plaintiff did not have any sensory or reflex loss. *See, e.g., id.* at 504, 630, 693-95. The ALJ therefore did not err at step three when he found plaintiff did not meet or equal Listing 1.04A. Consequently, the ALJ also did not err in failing to discuss plaintiff's use of a walker at step three because the inability to ambulate effectively was not one of the criteria of Listing 1.04A.[8]

---

[8]    Parties in other cases have argued that the regulations require a claimant to satisfy all of the requirements of Listing 1.04A *and* be unable to ambulate

But plaintiff does not contend she met Listing 1.04A because she had nerve root compression. Instead, plaintiff asserts that so long as she could not ambulate effectively pursuant to Listing 1.00B2b(2), then she was disabled under Listing 1.04A or 1.04 even if she did not suffer from neurological deficits. Reply at 1-3. Listing 1.00 is the introduction to the disorders of the musculoskeletal system and Listing 1.00B defines "loss of function."

As an initial matter, no physician indicated a walker was a medical necessity and, in fact, two physicians opined an assistive device was not a necessity, at least not for occasional walking. AR at 504, 633. Thus, even if plaintiff's argument were correct and the use of a walker was sufficient to meet Listing 1.04A, the ALJ did not err because the record did not show that plaintiff's use of a walker was a medical necessity.

More importantly, plaintiff's argument is plainly incorrect. A claimant cannot meet Listing 1.04A simply because she has a disorder of the spine and cannot ambulate effectively. To decide otherwise would obviate section A of Listing 1.04. And to the extent plaintiff argues that Listing 1.04, by itself, is an impairment constituting disability, such an interpretation ignores the clear language of Listing 1.04. Listing 1.04 is an impairment constituting disability only if a claimant satisfies the elements of 1.04 *with* the elements of A, B, or C.

Plaintiff's argument in the alternative – the ALJ should have called a medical expert to clarify whether plaintiff's equaled a Listing or to clarify the onset date – is similarly unavailing. First, because plaintiff has not offered a theory as to

_____

effectively in order to meet Listing 1.04A. *See* 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3) (stating that an impairment "meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."). The District Courts in this Circuit are split on this issue. *See, e.g., Franco v. Colvin*, 2014 WL 790912, at *22 (E.D. Cal. Feb. 26, 2014); *Espejo v. Astrue*, 2009 WL 1330799, at *3 n.2 (C.D. Cal. May 11, 2009).

how his impairments equaled Listing 1.04A, the ALJ's decision not to call a medical expert was not error. *See Lewis*, 263 F.3d at 514 (ALJ did not err when he did not explain why he found claimant's impairment did not equal a Listing because claimant failed to offer a theory as to how the impairments equaled a Listing). Second, plaintiff was found disabled as of February 1, 2013 due to a *mental* impairment. The ALJ found plaintiff was not disabled due to her *physical* impairments. An ALJ is not required to consult a medical expert regarding an onset date when he already determined the claimant was not disabled. *See Horn v. Astrue*, 345 Fed. Appx. 235, 236 (9th Cir. 2009).

Accordingly, the ALJ did not err at step three.

**E.      The ALJ Failed to Properly Consider Lay Testimony**

Plaintiff contends the ALJ failed to provide germane reasons for rejecting the testimony of a lay witness, Darin Ravy. P. Mem. at 22-23.

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence and therefore *cannot* be disregarded without comment." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks, ellipses, and citation omitted); *see Smolen*, 80 F.3d at 1288; *see also* 20 C.F.R.§§ 404.1513(d)(4), 416.913(d)(4) (explaining that the Commissioner will consider all evidence from "non-medical sources[,]" including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy"). The ALJ may only discount the testimony of lay witnesses if he provides specific "reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *see Lewis*, 236 F.3d at 511 ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and give reasons germane to each witness for doing so.").

Darin Ravy, plaintiff's boyfriend, completed a Third Party Function Report on September 30, 2012. AR at 286-95. In the Function Report, Ravy stated that

plaintiff: suffered from pain, had panic attacks when away from home; fed his dogs with the help of others; required help with personal care; prepared sandwiches, soup, cereal and frozen dinners for meals; did light laundry and dishes; shopped with the aid of a wheelchair or walker; talked with friends on the phone; and went out to dinner twice a month. *Id*. at 286-92. Ravy stated plaintiff could walk about two hundred feet before she needed to rest, required medication to pay attention, and could not lift, push or bend. *Id*. at 290, 292.

The ALJ appeared to give Ravy's opinion some weight but discounted it to the extent it was inconsistent with the RFC determination. *Id*. at 17. The ALJ specifically noted that the medical evidence did not support a more restrictive RFC. *Id*. In other words, the ALJ rejected Ravy's opinion to the extent it was not supported by the medical evidence.

An ALJ may reject lay testimony if it is *inconsistent* with medical evidence, but not if it is simply *unsupported* by medical evidence. *Compare Lewis*, 236 F.3d at 511 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.") (citing *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) with *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017) (a lack of support from the medical evidence is not a proper basis for disregarding lay observations); *Bruce v. Astrue*, 577 F.3d 1113, 1116 (9th Cir. 2009) (same). In finding that a lack of support from medical evidence is not a germane reason to discount lay testimony, the Ninth Circuit notes that the "fact that lay testimony . . . may offer a different perspective than medical records alone is precisely why such evidence is valuable at a hearing." *Diedrich*, 874 F.3d at 640 (citing *Smolen*, 80 F.3d at 1289).

Accordingly, the ALJ did not provide a germane reason for discounting the Third Party Function Report of Darin Ravy.

## V.

## REMAND IS APPROPRIATE

The decision whether to remand for further proceedings or reverse and award benefits is within the discretion of the district court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). It is appropriate for the court to exercise this discretion to direct an immediate award of benefits where: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinions; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014) (setting forth three-part credit-as-true standard for remanding with instructions to calculate and award benefits). But where there are outstanding issues that must be resolved before a determination can be made, or it is not clear from the record that the ALJ would be required to find a plaintiff disabled if all the evidence were properly evaluated, remand for further proceedings is appropriate. *See Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000). In addition, the court must "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, there are numerous outstanding issues to be resolved and remand is required. On remand, the ALJ shall reconsider plaintiff's credibility, and either credit her subjective complaints or provide clear and convincing reasons for rejecting them, and reconsider the lay testimony and either credit it or provide germane reasons supported by substantial evidence for rejecting it. The ALJ shall also reconsider the opinions of the treating physicians and either credit the medical opinions or provide legally sufficient reasons supported by substantial evidence for rejecting them, and also reconsider the onset date of the disability due to a mental disorder. Given that plaintiff's fracture had not healed within twelve months as

expected, the ALJ should either retain a medical expert or obtain additional medical evidence from plaintiff's treating physicians to help his inquiry. The ALJ shall then reassess plaintiff's RFC, and proceed through steps four and five to determine what work, if any, plaintiff is capable of performing since the determined onset date.

## VI.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.

DATED:  May 25, 2018

SHERI PYM
United States Magistrate Judge